# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JESSICA KIRINCICH, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 15 C 2131 |
| ILLINOIS STATE POLICE, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Jessica Kirincich, a former state trooper, has sued the Illinois State Police alleging disability discrimination. In particular, Kirincich alleges that ISP violated her rights under the Americans with Disabilities Act by failing to offer her a reasonable accommodation that would have allowed her to continue her job as a state trooper. ISP has moved for summary judgment, pointing to its multiple offers of alternative positions and arguing that no reasonable jury could find that it failed to comply with the ADA. The Court grants summary judgment in favor of ISP for the reasons set out below.

### Background

Because ISP has moved for summary judgment motion, the Court views the evidence and draws all reasonable inferences in the light most favorable to Kirincich, the nonmoving party. *See Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010).

Kirincich has suffered from Type 1 diabetes since she was a child. In August

2011, the Illinois State Police hired Kirincich. It was aware of Kirincich's diabetes before hiring her. At the time of her hiring, Kirincich's diabetes appeared to be well controlled. For thirteen years, an endocrinologist named Dr. Yohay has treated her, using a program that aims to maintain her blood sugar levels and reduce the risk of diabetic complications. In the time after ISP hired her, however, Kirincich experienced at least two hypoglycemic episodes in which her blood sugar got so low that she lost consciousness.

In late 2012 or early 2013, ISP assigned Kirincich to the night shift, her second-place shift request, requiring her to be on patrol from 10 p.m. to 8 a.m. the following day. As a part of her duties, Kirincich had to drive a squad car, investigate crimes, and intervene in ongoing criminal activity. Kirincich was also required to appear in court following the end of her shift if necessary, thereby extending her shift on an unpredictable basis. She was also required to be on call for statewide emergencies or other off-shift requirements.

In February 28, 2013, Kirincich suffered a hypoglycemic episode while on patrol as a state trooper. This caused her to lose consciousness and drive erratically for several miles. She ran a red light, drove over the dotted center line, and collided with several other vehicles at a high rate of speed. Ultimately, her vehicle stopped as a result of the collisions, and firefighters cut the roof off of her squad car to extricate her. She was taken to the hospital by ambulance. Kirincich has little memory of the hypoglycemic episode, but she does not dispute that it happened.

After Kirincich's hypoglycemic episode, ISP placed her on restricted status in order to evaluate her ability to continue working as a state trooper. A medical review

board considered Kirincich's case history, a history and background of the on-duty hypoglycemic episode (and an off-duty hypoglycemic episode from December 2012), the dashcam video from the collision, and Kirincich's own testimony. Ultimately, ISP's medical review board referred her to an endocrinologist, Dr. Valika, for an independent medical evaluation. Dr. Valika noted that Kirincich's blood sugar level should be closely monitored and controlled, but he recommended that her treating physician Dr. Yohay would have more insight on her ability to work based on the chronic nature of diabetes and the physician's long relationship with her.

After conducting additional meetings to review Dr. Valika's notes and other information related to Kirincich's disability and accident, ISP determined that Kirincich could no longer perform the essential functions of her position. ISP began the process of finding an accommodation by sending Kirincich a letter stating that she was unable to perform the essential functions of a sworn officer and could no longer continue in her positions as a trooper. The letter identified her options moving forward, including applying for a reassignment to a civilian position.

Following a meeting on November 5, 2013, Kirincich, as directed, submitted an application for reassignment to a civilian position. In the application, however, she requested not a civilian position as such but rather an accommodation of "patrol change to a day shift," explaining that the "night shift causes [her] blood sugar levels to become unstable and lead to complications for [her] diabetes." Kirincich further noted that Dr. Yohay had "advised [her] that working exclusively on a day shift would alleviate the possibility that [her] blood sugar levels w[ould] become unbalanced and (sic) [her] to fully perform her duties without complications." Def.'s Ex. H, at Ex. 8.

On December 2, 2013, Kirincich's counsel submitted to ISP a letter from Dr. Yohay confirming the doctor's recommendation: "It is my opinion, as her treating physician, with knowledge of her duties, responsibilities, and conduct required of her as an Illinois State Trooper, that an assignment to a day shift would allow her to fully, completely, and safely perform all of her . . . patrol duties." Def.'s Ex. H, at Ex. 9. Dr. Yohay testified that she knew Kirincich was a state trooper and that she carried a badge. Dr. Yohay also testified that she assumed Kirincich regularly drove a vehicle for long periods of time. She did not testify that she knew the duties of state troopers beyond those just cited or that she had received any or information on the essential functions of state troopers.

ISP responded to Kirincich's correspondence by informing her that her request for a patrol change to a day shift conflicted with her request for a reassignment to a non-sworn, civilian position. The parties continued to correspond for over a year. As the process continued, Kirincich worked full time in a restricted duty status.

On October 3, 2014, ISP invited Kirincich to interview for a Guard II position at the James R. Thompson building in Chicago. On December 4, 2014, ISP invited her to interview for the position of truck weight stop inspector. Kirincich attended both interviews and was eventually offered both positions. She accepted the truck weight stop inspector position but took issue with the required transfer documentation. In particular, she took issue with the fact that the form framed her transfer as a "resignation" from her trooper position. She manually redacted the word resignation and replaced it with "end," noting that she "is not resigning" and that she felt ISP was not accommodating her under the ADA. Def.'s Ex. H, at Ex. 21.

4

ISP considered Kirincich's return of the form as a resignation from her trooper position and acceptance of the truck weight stop inspector position. It scheduled her to report to that position on February 1, 2015. In the meantime, ISP notified Kirincich of an additional open position for which she could interview. This position—a Criminal Intelligence Analyst—offered a salary considerably higher than that of the truck weight stop position or her state trooper position. Kirincich interviewed for that position, and on February 9, 2015, ISP offered the position to her. When ISP notified Kirincich that she had been offered this position, it noted that this was her third offer of an alternative accommodation and stated that if she declined the open offers, she would be terminating the reasonable accommodation process. Despite this warning, Kirincich did not report for duty on any of the positions she had been offered. She then filed this lawsuit.

**Discussion**

Summary judgment is proper if the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378-80 (2007).

The Americans with Disabilities Act prohibits discrimination against a qualified individual with a disability. *See* 42 U.S.C. § 12112(a). Further, it requires employers to

5

provide reasonable accommodations to qualified individuals to the extent that this does not impose an undue hardship on the employer. *Id.* § 12112(5)(A). Only a disability that substantially limits an individual's ability to engage in one or more major life activities is covered. *Id.* § 12102(1). The parties do not dispute that Kirincich's diabetes was a qualifying disability.

Although Kirincich's complaint and brief do not specify in so many words what type of ADA claims she asserts, her arguments indicate that she is asserting a failure-to-accommodate claim. *See* Pl.'s Resp. at 13 ("Plaintiff need *not* provide any such evidence of discrimination where defendant has violated the ADA by refusing a reasonable accommodation request. All that plaintiff needs to demonstrate . . . is the employer's failure to make reasonable accommodations for the known limitations of the disabled employee").

**A.     Qualified individual**

A plaintiff asserting a failure-to-accommodate claim must show: 1) she is a qualified individual with a disability; 2) her employer was aware of her disability; 3) her employer failed to reasonably accommodate her disability. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015). ISP does not dispute that Kirincich has a disability of which ISP was aware. It contends, however, that Kirincich was not a "qualified individual" under the ADA and that in any event it reasonably accommodated her disability.

ISP maintains that Kirincich was not a qualified individual because she could not perform the essential functions of her position either with or without an accommodation. In particular, it points to the hypoglycemic episode she suffered while on the job and her

6

subsequent medical release to work exclusively on the day shift—an arrangement that ISP says is inconsistent with the duties of a state trooper. Kirincich argues that she could have performed the essential functions of her job with an accommodation. She argues that an exclusive day-shift assignment would have eliminated the risk that she might experience another hypoglycemic episode and endanger herself or others.

### 1. Essential functions of a state trooper

An individual is qualified under the ADA if she is able to perform the essential functions of her position with or without a reasonable accommodation. 42 U.S.C. § 12111(8). An individual is not qualified if she "presents a direct threat to h[er] own health and safety or that of others." *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005). A determination that an employee poses a direct threat must be premised upon a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job. *Id.*

ISP maintains that Kirincich was not a qualified individual because her doctor released her to work only if she could work exclusively on the day shift—a restriction that ISP contends conflicts with the nature of the position of state trooper. Kirincich contends that working at night was not an essential function of the position and that she would have been able to perform the essential functions if she was permitted to work only on a day shift.

ISP contends that one of the essential functions of a state trooper is being available twenty-four hours a day, seven days a week for emergency call-ups in the

7

case of arrests, state emergencies, or civil disturbances. *See* Def.'s Ex. B, 61:16-63:19. Kirincich does not dispute the twenty-four-hour availability requirement—though she does take issue with some of the categories of work for which a trooper might be called in. *See* Pl.'s Resp. to Def.'s Stat. of Facts ¶25 ("Disputed in part. The cited testimony does not establish that Plaintiff was needed for prison riots, manhunts or civil unrest"). By failing to contest anything other than those details, Kirincich effectively admits that a trooper must be available at all times as an essential function of the job.

### 2. Ability to perform essential functions

The Court next considers whether a reasonable jury could find that Kirincich was capable of performing the essential functions of the job of state trooper with or without an accommodation, a point on which Kirincich bears the burden of persuasion. *See, e.g.*, *Bay v. Cassens Transport Co.*, 212 F.3d 969, 973 (7th Cir. 2000). No reasonable jury could find that Kirincich could perform as a state trooper at night—primarily because she and her doctor have admitted that she cannot.

Kirincich's primary argument appears to be that ISP substituted Dr. Yohay's medical judgment with its own. No reasonable jury could make such a finding. Indeed, ISP accepted Dr. Yohay's medical determination that to minimize the risk of another hypoglycemic episode, Kirincich could only work a day shift. That, however, is the problem, given the fact that ability to work at night is an essential function of the position. Kirincich's contention seems to be that ISP ought to have deferred to Dr. Yohay's implicit view that the job of a state trooper did not require work at night. But Dr. Yohay herself admitted that she was unsure of the total range of duties required to be a state trooper.

This case is similar to *Webster v. Methodist Occupational Health Centers, Inc.*, 141 F.3d 1236 (7th Cir. 1998), in which the Seventh Circuit affirmed the district court's grant of summary judgment for an employer on the ground that the employee's requested (and indeed, required) accommodation was unreasonable. The plaintiff in *Webster* suffered a stroke that rendered her unable to perform the essential functions of her nursing position unless she had supervision. Her employer refused to grant the accommodation and instead terminated her. The Seventh Circuit concluded that the necessary accommodation—constant supervision during Webster's shift—would have been economically prohibitive and objectively unreasonable.

Kirincich takes issue with ISP's reliance on *Webster*. First, she points out that the Seventh Circuit partially rested its holding on the "prohibitively expensive" nature of the plaintiff's only possible accommodation, concluding that Webster's proposed accommodation was unreasonable "because it meant that it could not reinstate [her] without effectively paying a double salary for her." *Webster*, 141 F.3d at 1238. Kirincich is correct that this is not the case here. But the cases are similar in that in both *Webster* and this case, the employee's physician released her to return to work only if she was granted a particular accommodation. In this case as in *Webster*, the requested accommodation essentially renders the plaintiff unable to perform the essential functions of her job. Because a state trooper is required to be available at all times regardless of her assigned shift, and because Kirincich's own doctor—whose opinion she relies on entirely—opined that she could return to work only if confined to a day shift, no reasonable jury could find that Kirincich could perform the essential functions of her position.

9

### B. Failure to accommodate

Even though Kirincich could not perform the essential functions of a state trooper, ISP was required to engage in an interactive process to determine if there was an accommodation that would allow her to continue working for the agency. *See Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000) ("[T]he ADA requires an employer to reassign a disabled employee to a vacant position for which the employee is otherwise qualified."); *but see Webster*, 141 F.3d at 1238 (acknowledging the reassignment requirement but noting that the employee broke down the interactive process).

Kirincich argues that the accommodations ISP offered were unreasonable because they were unsworn positions that constituted "demotions." Pl.'s Resp. at 5 ("As a result of the ISP's decision, the Plaintiff was demoted . . . ."). She also contends that the proposed accommodations were unreasonable because ISP required her to sign a resignation form before transferring her to a new position. It appears that Kirincich contends that the only reasonable accommodation would have been one that allowed her to keep her trooper status and duties. *See id.* ("Plaintiff . . . is no longer able to carry a gun; is no longer able to drive a squad car; is no longer able to perform the duties of a sworn trooper; she is limited to a desk job . . . .").

ISP argues that its offer of alternative positions fulfilled its obligations under the ADA given Kirincich's admitted medical limitations and her resultant inability to perform the essential functions of a trooper. Further, ISP argues that even if a day-shift accommodation could have allowed Kirincich to perform the essential functions of the trooper position, it was not required to make that accommodation because of ISP's

10

established seniority system.

### 1. Alternative positions

After an employee's initial disclosure of her disability, "the ADA requires the employer to engage with her in an 'interactive process' to determine the appropriate accommodation under the circumstances." *EEOC v. Sears, Roebuck, and Co.*, 417 F.3d 789, 804 (7th Cir. 2005). The interactive process "imposes a duty upon employers to engage in a flexible . . . process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). The Seventh Circuit has described the interactive process as having "give-and-take" elements—"if an employee has requested an appropriate accommodation, the employer may not simply reject it without offering other suggestions or at least expressing a willingness to continue discussing possible accommodations." *Sears, Roebuck and Co.*, 417 F.3d at 806.

Kirincich (along with her doctor) proposed a shift transfer as the only appropriate accommodation for her disability. ISP does not dispute that it declined to grant this request. But a refusal to grant a particular accommodation does not automatically subject an employer to liability. An employer "flunk[s] its obligation under the ADA" when, in the face of a shift transfer request, it refuses to grant the request and then does nothing to engage in finding alternative accommodations. *Gile*, 213 F.3d at 373. Kirincich does not dispute that ISP did not simply say no but rather attempted to find alternative accommodations. In fact, she points directly to the proposed alternative positions, claiming that they were unreasonable because they necessitated resignation

11

from her original position.

Kirincich contends that ISP should have found a way to accommodate her while allowing her to remain a trooper. The ADA, however, does not require this. An attempt to reassign a disabled employee to an alternative position is not simply acceptable, it is required if the employee cannot perform the essential functions of her position and there are no other available accommodations. 42 U.S.C. § 12111(9)(B). In considering reassignment to a different position, the employer must make a reasonable effort to explore the possibilities with the employee. *Hendricks-Robinson*, 154 F.3d at 693. It is undisputed that ISP explored possibilities with Kirincich, ultimately offering her three alternative positions—one of which, the Court notes, paid more than her trooper position. Kirincich may not have been satisfied with those alternatives, but that does not make ISP liable. The ADA does not require employers to "bump" other employees or create new positions to reassign a disabled employee. *Gile*, 213 F.3d at 374. Rather, it requires an employer to reassign a disabled employee to a vacant position for which the employee is otherwise qualified. *Id.* No reasonable jury could find that ISP failed to engage in the interactive process, because no reasonable jury could find that ISP failed to offer Kirincich alternative positions as reasonable accommodations.

    2.    **Breakdown of interactive process**

That said, the interactive process did not ultimately succeed. Kirincich is now unemployed, having never reported for duty on any of the alternative positions that ISP offered her. If reasonable accommodations were available, the question is which party caused the breakdown. *Sears, Roebuck, and Co.*, 417 F.3d at 805.

It is undisputed that ISP maintains a variety of "non-sworn" positions that are not

subject to the same night-shift requirements as the position of state trooper. Kirincich disputes that these positions were reasonable accommodations, arguing that their non-sworn status constituted a demotion. But even a position that amounts to a demotion may be a reasonable accommodation in appropriate circumstances. *Gile*, 213 F.3d at 374. "[T]he employer is obligated to identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites and consider transferring the employee to any of those other jobs, including those that would represent a demotion." *Id.*

Kirincich argues that the interactive process broke down when ISP required her to sign a resignation form. ISP disagrees, arguing that Kirincich caused the breakdown when she failed to report to work in her newly assigned position. Alternatively, ISP argues that even if the resignation requirement broke down the process, the agency complied with the ADA because the alternative positions it offered Kirincich remained on the table until she rejected them by failing to report for duty.

If an employer "takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate . . . ." *Id.* It is undisputed that ISP offered Kirincich alternative positions that would have aligned with her need to work only during daytime hours. It is likewise undisputed that Kirincich accepted one of the positions but failed to report for duty. Given these circumstances, no reasonable jury could find that ISP acted in bad faith or tried to thwart the interactive process and block reasonable accommodations. Indeed, "[a]n employer cannot 'reasonably accommodate' an employee who refuses to return to work." *Weiler v. Household Corp.*, 101 F.3d 519, 526 (7th Cir. 1996).

But even if ISP *did* prompt the end of the interactive process, it argues that it complied with the ADA because the alternative positions it offered Kirincich were reasonable and remained available to her. For this proposition, ISP cites *Rehling v. City of Chicago*, 207 F.3d 1009 (7th Cir. 2000). In *Rehling*, the Seventh Circuit held that a reasonable accommodation offered by an employer was not rendered unreasonable simply because there was some defect in the interactive process. *Id.* at 1016. As in this case, the employer in *Rehling* offered the employee two alternative positions. Rehling argued that the positions were inadequate because of the method of their selection—specifically, because the employer allegedly failed to engage in a truly interactive process. In affirming summary judgment for the employer on Rehling's accommodation claim, the Seventh Circuit concluded that "a plaintiff must allege that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." *Id*. Kirincich makes no viable contention along these lines. She takes issue with the types of alternative positions ISP offered her, but she has not offered evidence that there were additional alternative positions available for which she was qualified.

**3.    Seniority system**    Finally, ISP argues that even if Kirincich had been qualified—that is, even if she could have performed the essential functions of the position with a reasonable accommodation of a shift change—the shift change she requested would have been unavailable to her. ISP contends that it had in place an established system whereby employees bid on their top shift choices, and such preferences are assigned according to seniority. In response, Kirincich counters that ISP has failed to demonstrate that transferring her actually would have been out of step

with the seniority system—in other words, she alludes to a possibility that she would have had the requisite seniority for a transfer even if she did not require a disability accommodation.

But Kirincich's arguments are misplaced. All that the law requires ISP to do is present evidence demonstrating that it employed a seniority system and that system's rules. *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 405 (2002) ("[T]he employer's showing of violations of the rules of a seniority system is by itself ordinarily sufficient"). Indeed, the Supreme Court has held that "to require the typical employer to show more than the existence of a seniority system might well undermine the employees' expectations of consistent, uniform treatment—expectations upon which the seniority system's benefits depend." *Id.*, at 404. Because ISP has presented evidence demonstrating that it had a seniority system in place for shift transfers that doled them out based on seniority, it has met its burden.

Still, Kirincich is correct to argue that there may be exceptions to the rule in some cases. An employer is not required to offer an accommodation that would conflict with the rights of other employees under an established seniority system, unless the employee can establish "special circumstances that make an exception from the seniority system reasonable in the particular case." *U.S. Airways, Inc.*, 404-06. For instance, if an employer's official policies mandate a seniority system but it regularly ignores the system or operates outside of its bounds, or if the system contains exceptions, the ADA may require the employer to make an exception in order to accommodate an employee's disability. *Id.* at 405. Kirincich, however, has offered no evidence from which a finding reasonably could be made that ISP operated outside the

bounds of its seniority system. In fact, her testimony has done the opposite—she has demonstrated that ISP *did in fact* have a seniority system through which it *did in fact* assign its troopers' shifts.

Kirincich has not meaningfully disputed the existence or enforcement of the seniority system. A collective bargaining agreement and subsequent memoranda lay out the seniority system in full. Kirincich testified that she was a member of the Fraternal Order of Police, which she acknowledged subjected her to an employment contract—and although she did not affirmatively testify that the employment contract she referenced was the CBA, no reasonable jury could find otherwise. *See* Def.'s Ex. H, at 50:6-12; Def.'s Ex. H, at Ex. 29. Further, she testified regarding her understanding of seniority-based shift assignments, noting that she had been assigned to the night shift through the exact process she questions now. She also testified that she felt comfortable with her seniority status as listed in ISP's documentation, noting that although some of the employees listed in 2012 might no longer be at ISP, her general placement was correct in terms of sequence. *See id.* at 237:17-246:9; *see also* Def.'s Ex. H, at Ex. 30 (listing Kirincich as 30th out of 34 employees in 2012). This testimony essentially proves ISP's point—ISP utilized a seniority system for shift changes, and there is no evidence of deviations. Thus Kirincich's arguments regarding ISP's seniority system fall short of the mark.. .

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [dkt. no. 26] and directs the Clerk to enter judgment in favor of defendant and

against plaintiff.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 22, 2016